**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Augustin ALVAREZ, Oscar Hernandez, Mario C. Simon, Rolando Rios, Ramon Raymond, Eduardo Portal, Victoriano Concepcion, a/k/a "Macho" Defendants-Appellants.**

No. 83–5333.

United States Court of Appeals,
Eleventh Circuit.

March 20, 1985.

Manuel Mari, Miami, Fla. (Court appointed), for A. Alvarez.

Nurik, O'Donnell & Lazarus, John F. O'Donnell (Court appointed), Fort Lauderdale, Fla., for O. Hernandez.

Anthony T. Carbone, Miami, Fla. (Court appointed), for M. Simon.

Thornton, Rothman, Adelstein & Moreno, Federico A. Moreno (Court appointed), Miami, Fla., for R. Rios.

Peter C. Clemente, Miami, Fla. (Court appointed), for R. Raymond.

Leon E. Tozo, Miami, Fla. (Court appointed), for E. Portal.

Humerto J. Aguilar (Court appointed), Fernandez Caubi, Fernandez & Aguilar, P.A., Miami, Fla., for V. Concepcion.

Stanley Marcus, U.S. Atty., Jon May, James G. McAdams, Linda Collins-Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before KRAVITCH and HATCHETT, Circuit Judges, and HANCOCK *, District Judge.

KRAVITCH, Circuit Judge:

On December 2, 1982, in a run-down motel in the Little Havana section of Miami, Florida, a cocaine deal turned into tragedy when a shoot-out erupted between the dealers and two undercover special agents from the Bureau of Alcohol, Tobacco, and Firearms (BATF). During the shoot-out, one of the BATF agents was killed and the other agent, along with two of the cocaine dealers, was seriously wounded. Appellants Augustin Alvarez, Mario Simon, Victoriano "Macho" Concepcion, Eduardo Portal, Oscar Hernandez, Ramon Raymond, and Rolando Rios were convicted after a trial by jury on various charges arising from the cocaine deal and shoot-out. All of the appellants were convicted of conspiracy to possess with intent to distribute cocaine, 21 U.S.C. § 846, and possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1). In addition, Alvarez and Simon were convicted of first degree murder of a federal agent, 18 U.S.C. §§ 1111(a) and 1114, assault on a federal agent by means of a deadly and dangerous weapon, 18 U.S.C. §§ 111 and 1114, and use of a firearm to commit a felony, 18 U.S.C. § 924(c)(1). Portal, Concepcion, and Hernandez were convicted of second degree murder of a federal agent, 18 U.S.C. §§ 1111(a) and 1114, and assault on a federal agent by means of a deadly and dangerous weapon, 18 U.S.C. §§ 111 and 1114.

The appellants now appeal their respective convictions, raising numerous claims of error. Among the issues raised by this appeal are (1) whether BATF agents are protected under 18 U.S.C. § 1114, (2) whether the district court committed plain error by instructing the jury that the government was not required to prove that the appellants knew that their victims were federal agents, and (3) whether the second degree murder and assault convictions of

Portal, Concepcion, and Hernandez were based on an improper extension of *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). After careful consideration of these issues and the others raised by the appellants, we conclude that the district court did not commit reversible error and the appellants received a fair trial in every respect. We therefore affirm the appellants' convictions.

I. FACTS

On December 1, 1982, at about 6:00 p.m., BATF Special Agents Joseph Benitez, Joseph Tirado, Ariel Rios, and Alex D'Atri, each acting in an undercover capacity, met with appellants Rolando Rios and Ramon Raymond in the parking lot of a convenience store in Homestead, Florida. The purpose of the meeting was to continue previously initiated negotiations for the purchase of two kilograms of cocaine. Raymond informed the agents that he had obtained a source for the cocaine, but that delivery would be delayed by about a half hour. Raymond attempted to telephone his cocaine source but was unsuccessful. Agent Tirado then asked appellant Rios if he knew when the cocaine would be delivered. Appellant Rios also attempted to telephone the cocaine source but, like Raymond, was unsuccessful. Appellant Rios asked Agents Rios and Tirado to take him to the source's residence. The three men drove to a house about two miles away, but, finding no one there, returned to the parking lot. Meanwhile, Raymond continued to assure the remaining agents that the cocaine would be delivered shortly. At one point, Raymond suggested that the deal be moved across the street because he thought that there were too many cars in the parking lot.

A short time later, appellant Eduardo Portal arrived at the parking lot and began speaking with appellants Rios and Raymond. Portal informed Agents Rios, Tira-

* Honorable James Hughes Hancock, U.S. District Judge for the Northern District of Alabama, sitting by designation.

do, and Benitez that he could make immediate delivery of two kilograms of cocaine. Portal then made a telephone call to appellant Victoriano "Macho" Concepcion. After the call, Portal told the agents that delivery of the cocaine could be made by noon the next day. The agents departed after agreeing to call Concepcion the next morning to arrange the details of the cocaine delivery.[1]

The next day, at about 12:00 noon, Agent Rios telephoned Concepcion and arranged to meet with Concepcion and Portal in the parking lot of a restaurant in the Little Havana section of Miami. Agents Rios and D'Atri met with Concepcion and Portal shortly before 2:00 p.m. D'Atri told Concepcion that he wished to purchase three kilograms of cocaine. Concepcion answered that the cocaine was available at a price of $49,000 per kilogram. The four men left the restaurant parking lot and proceeded, in two separate cars, to the Hurricane Motel on West Flagler Street in Miami. The agents advised their surveillance team of their destination by means of a portable radio concealed in their car.

Shortly after 2:00 p.m., Agents Rios and D'Atri and appellants Concepcion and Portal arrived at the Hurricane Motel. Concepcion advised the agents that only one of them would be allowed inside the motel to complete the deal. The agents refused to proceed under those circumstances, and Concepcion agreed to allow both agents to be present. Concepcion and the two agents entered the motel office, while Portal remained outside. Surveillance agents stationed near the motel observed Portal acting as a "lookout." The agents saw Portal closely watching passing cars and pedestrians, and noticed a handgun-shaped bulge on Portal's left side, under his shirt.

Inside the motel office, Concepcion and the two agents met appellants Augustin Alvarez and Oscar Hernandez. Hernandez was the manager of the Hurricane Motel, and Alvarez and Hernandez shared an apartment that adjoined the motel office. Alvarez told the agents that he was not the cocaine source, but that he would make a telephone call and arrange the cocaine delivery. Alvarez made the call and informed the agents that the cocaine would be delivered shortly. The five men waited in the living room of the Alvarez-Hernandez apartment. While they waited, Alvarez and Agent Rios conversed in Spanish, with Agent Rios translating into English for Agent D'Atri's benefit. According to D'Atri's testimony at trial, Alvarez stated, "In this business, you have to be careful. It's a dangerous business. You have to watch out for rip-offs and Federal agents." Alvarez also stated that he would never go back to prison, and that he would rather be dead than go back to prison. D'Atri answered, "It's always better to be alive than in prison." Alvarez then spoke to Hernandez in Spanish, and D'Atri asked Hernandez what Alvarez had said. Hernandez replied that Alvarez had said that he could never go back.

After twenty· or twenty-five minutes, D'Atri decided to make a telephone call to let the surveillance team know that the cocaine deal was still pending. D'Atri asked Hernandez for permission to use the telephone. Hernandez spoke to Alvarez in Spanish, and then indicated that D'Atri could use the telephone in the motel office. After completing the telephone call, D'Atri returned to the living room and joined the other men in general conversation. At one point, Alvarez went into a bedroom, got a sample of cocaine, and asked D'Atri if he wanted to test the sample. D'Atri replied that he wanted to test the cocaine that was about to be delivered, not Alvarez' sample.

After twenty more minutes, D'Atri, who was becoming increasingly concerned about the prolonged delay, announced that he and Agent Rios were leaving. Hernandez said, in English, "Don't worry, he's coming. If he says he's coming, he will be here." At the same time, appellant Mario

---

**1.** Appellants Rios and Raymond were arrested by Agent Benitez during the afternoon of December 2, 1982. Raymond was arrested at the hotel where he worked, and appellant Rios was arrested at home.

Simon drove into the motel parking lot. Hernandez said, "He's here," and the men all laughed. Simon entered the living room,[2] and D'Atri asked him whether he had the three kilograms of cocaine. Simon answered, in English, "I have to make a phone call." After making the call, Simon told the agents that he could deliver the cocaine, but that it would take one hour. He also said that he would deliver one kilogram of cocaine at 4:00 p.m., and one kilogram every hour after that. The agents agreed to return to the motel in about one hour.[3]

Agents Rios and D'Atri drove to a nearby restaurant and met with Special Agent Michael Casali, one of the members of the surveillance team. During the meeting, Agent Rios expressed concern about a leather pouch carried by Simon, which Agent Rios thought might contain a weapon. The agents then discussed their plans for effecting the intended drug arrests. The agents decided to place $50,000 in the trunk of their car. Once the cocaine was delivered, Agent Rios would go out to the motel parking lot and remove the money from the trunk. Upon observing this signal, the surveillance and backup agents would wait forty-five seconds to a minute, and then move in to effect the arrests.

At about 4:15 p.m., Agents Rios and D'Atri returned to the motel, but Simon had not yet returned with the cocaine. The agents drove around the area of the motel for several minutes. At about 4:25 p.m., the agents noticed Simon's car in the parking lot of the motel. The agents entered the motel and found Simon, Alvarez, and Concepcion in the living room where the earlier meeting had taken place. Agent D'Atri asked Simon whether he had the cocaine, and Simon replied, "Yes, it is in

the car." Simon went out to his car, and returned with a plastic bag. Concepcion took the bag from Simon and removed a cardboard box from the bag. Concepcion handed the box to D'Atri, who opened the box and found another plastic bag containing what appeared to be about one kilogram of cocaine. D'Atri then asked Agent Rios to go out to their car and get the money.

Agent Rios returned to the living room and handed the money, which was in a paper bag, to D'Atri. D'Atri noticed Simon, who was partially seated on and resting against the armrest of a couch, looking out the window and nervously fidgeting with the leather pouch that was suspected to contain a weapon. The other men were all seated on the couch. D'Atri took the money out of the paper bag, stood up, and began to count the money. Again, D'Atri noticed Simon looking out the window and fidgeting with the pouch. At about this time, the surveillance and backup agents began to converge on the motel.

D'Atri heard the surveillance and backup agents arrive at the door of the motel office. Suddenly, Agent Rios shouted, "No," and D'Atri heard a gunshot. D'Atri drew his gun and held it on Concepcion and Alvarez. Meanwhile, out of the corner of his eye, D'Atri saw Simon and Agent Rios engaged in a struggle. D'Atri heard another gunshot, and he turned to help Agent Rios.[4] D'Atri lunged at Simon, but, as he reached Simon, he felt tremendous pain in his forehead and left arm. D'Atri fired several shots at Simon, emptying his weapon in the process. D'Atri then looked up and saw Alvarez aiming a chrome-plated .357 Magnum pistol at him. Alvarez fired one shot at D'Atri, hitting him in the chest. D'Atri saw Alvarez take two steps

---

**2.** Hernandez left the room upon Simon's arrival, and was not present when the subsequent negotiations occurred. Hernandez was arrested in the courtyard of the motel immediately before the shoot-out began on the afternoon of December 2, 1982.

**3.** After this first meeting at the Hurricane Motel, Portal drove to his home in Homestead, Florida, in Concepcion's car. Portal did not

return to the motel that day, and he voluntarily surrendered to police on December 4, 1982.

**4.** At about this time, Concepcion leaped out a window, cutting his elbows on the glass, and landed on a car in the motel parking lot. He was immediately arrested by members of the surveillance team.

toward him and fire another shot. The impact of the second shot caused D'Atri to careen into the wall of the living room, where he blacked out.

During this time, the surveillance and backup agents were attempting to force their way into the motel. The agents finally shot the lock off the door of the motel office and entered the living room. The agents found Agent Rios on the couch with a gunshot wound in the face. Agent Rios had also been shot in the finger and the left thigh. Agent D'Atri was lying on the floor in a pool of blood, with four gunshot wounds. Simon, who was covered with blood, was leaning against the wall near a hallway that led to the bedrooms. A carbine rifle was at his feet. Alvarez was running down the hallway toward the bedrooms. Agent Casali yelled, "Freeze, police," but Alvarez ducked into a bedroom. Casali drew his gun and entered the bedroom. Alvarez looked up, saw Casali, and reached for a shotgun that was lying on the bed. Casali shot Alvarez. Casali then instructed Agent Switzer to watch Alvarez while Casali searched the other bedroom. When Switzer turned his back on Alvarez to help cover Casali's entry into the other bedroom, Alvarez again went for the shotgun, and Switzer shot him.

The surveillance and backup agents tried to administer first aid to Agent Rios, but he died before medical help could arrive. Agent D'Atri, Alvarez, and Simon were taken to the hospital, and eventually recovered from their wounds.

The cause of Agent Rios' death was determined to be the gunshot wound in the face. The bullet had lodged in the back of Agent Rios' skull. Expert testimony at trial indicated that the bullet that killed Agent Rios was fired from Alvarez' .357 Magnum pistol.

The appellants were indicted in the United States District Court for the Southern District of Florida as follows:

Count I: Conspiracy to possess with intent to distribute cocaine, 21 U.S.C. § 846 (all appellants);

Count II: Possession with intent to distribute cocaine, or aiding and abetting the same, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (all appellants);

Count III: First degree murder of Agent Ariel Rios, or aiding and abetting the same, 18 U.S.C. §§ 1111(a), 1114, and 2 (all appellants except Rios and Raymond);

Count IV: Assault on Agent Alex D'Atri by means of a deadly and dangerous weapon, or aiding and abetting the same, 18 U.S.C. §§ 111, 1114, and 2 (all appellants except Rios and Raymond); and

Count V: Use of a firearm to commit a felony, 18 U.S.C. § 924(c)(1) (Alvarez and Simon only).

In connection with Count III, the district court also instructed the jury on the lesser-included offense of second degree murder. The jury found all of the appellants guilty as charged, except that Portal, Hernandez, and Concepcion were found guilty of second degree murder under Count III. The district court sentenced Alvarez and Simon to life plus 50 years in prison, Hernandez to 30 years in prison, Concepcion to 25 years in prison, Portal to 22 years in prison, Raymond to 10 years in prison, and Rios to 8 years in prison. Each of the appellants also received a special parole term of 3 years as mandated by 21 U.S.C. § 841(b)(1)(A).

The appellants now raise numerous challenges to the validity of their respective convictions. All except appellants Rios and Raymond contend that (1) the murder and assault counts, Counts III and IV, should have been dismissed because BATF agents are not protected under 18 U.S.C. § 1114, and (2) the district court erroneously instructed the jury concerning the crimes charged in Counts III and IV. In addition, Portal, Concepcion, and Hernandez contend that (3) their convictions on Counts III and IV were based on an improper extension of *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), and (4) the district court erred by giving the lesser-included offense instruction in connection with Count III, thus allowing the jury to

reach a "compromise" verdict. Rios, Raymond, Portal, and Hernandez claim that (5) the evidence was insufficient to establish their knowing participation in the drug conspiracy. Hernandez also claims that (6) the district court erred by admitting coconspirator hearsay statements against him in violation of *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). Portal alleges that (7) the weight of the evidence supported his defense theory of entrapment, and the evidence was insufficient to establish his predisposition to commit the crime of conspiracy. Rios and Raymond contend that (8) the district court should have granted a severance so that they could have been tried separately from the other appellants. Finally, all of the appellants argue that (9) the district court should have granted a change of venue, (10) prosecutorial misconduct tainted the trial, (11) the district court erroneously admitted the statements translated by Agent Rios for the benefit of Agent D'Atri, and (12) the district court should not have allowed the BATF agents who testified at trial to remain in the courtroom during the closing arguments.

## II. DISCUSSION

### A. *Are BATF Agents Protected Under 18 U.S.C. § 1114?*

 Both the federal murder statute, 18 U.S.C. § 1111(a),[5] and the federal assault statute, 18 U.S.C. § 111,[6] apply to crimes committed against "officers and employees of the United States" as listed in 18 U.S.C. § 1114.[7] The appellants who were convicted of the murder of Agent Rios and the assault on Agent D'Atri contend that the failure of Congress to mention explicitly BATF agents in section 1114 indicates that the murder or assault of a BATF agent is not a federal crime, and that Counts III and IV therefore should have been dismissed. We disagree.

The argument that BATF agents are not protected under section 1114 was rejected by the Second Circuit in *United States v. Lopez*, 586 F.2d 978 (2d Cir.1978), *cert. denied*, 440 U.S. 923, 99 S.Ct. 1251, 59 L.Ed.2d 476 (1979). The *Lopez* court explained that, prior to 1972, the functions of the BATF were conducted by the Internal Revenue Service (IRS), and IRS agents, officers, and employees were explicitly mentioned in section 1114. *See id.* at 979. In 1972, the Secretary of the Treasury ordered the transfer of IRS functions relating to alcohol, tobacco, firearms, and explosives to the BATF. Treas.Dept. Order No. 221, 37 Fed.Reg. 11696 (1972). After the 1972 transfer, Congress did not amend section 1114 to add BATF agents to the list of protected persons.

Such an amendment, however, is unnecessary. The situation is governed by 5 U.S.C. § 907(a), which provides:

A statute enacted, and a regulation or other action made, prescribed, issued, granted, or performed in respect of or by an agency or function affected by a reorganization under this chapter, before the effective date of the reorganization, has, except to the extent rescinded, modified, superseded, or made inapplicable by or

---

**5.** 18 U.S.C. § 1111(a) provides, in pertinent part:

(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing ... is murder in the first degree.

Any other murder is murder in the second degree.

**6.** 18 U.S.C. § 111 provides:

Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the per-

formance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years, or both.

Whoever, in the commission of any such acts uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

**7.** 18 U.S.C. § 1114 provides, in pertinent part:

Whoever kills ... any officer, employee or agent of the customs or of the internal revenue or any person assisting him in the execution of his duties ... shall be punished as provided under sections 1111 and 1112 of this title.

under authority of law or by the abolition of a function, the same effect as if the reorganization had not been made....

Under 5 U.S.C. § 907(a), any statute, regulation, or other action already in effect prior to the date of an executive reorganization of agency functions continues to have the same effect as if there had been no reorganization. *United States v. Irick,* 497 F.2d 1369, 1372 (5th Cir.1974), *cert. denied,* 420 U.S. 945, 95 S.Ct. 1325, 43 L.Ed.2d 423 (1975).[8]

Thus, the 1972 transfer of certain IRS functions to the BATF did not render section 1114 inapplicable to persons performing those functions. Rather, under 5 U.S.C. § 907(a), the designation of IRS agents in section 1114 also includes BATF agents. *Lopez,* 586 F.2d at 980; *see also Irick,* 497 F.2d at 1372 (reaching identical conclusion with respect to the 1973 transfer of functions of the Bureau of Narcotics and Dangerous Drugs to the Drug Enforcement Administration). We therefore hold, as the Second Circuit did in *Lopez,* that BATF agents are protected under 18 U.S.C. § 1114.[9] Accordingly, the district court did not err when it denied the appellants' motion to dismiss Counts III and IV.

### B. *Did the District Court Erroneously Instruct the Jury Concerning the Murder and Assault Charges?*

Those appellants who were convicted of murder and assault under Counts III and IV also contend that the district court erroneously instructed the jury concerning those counts. According to the appellants, the court should have instructed the jury that the government was required to prove that the appellants knew, at the time the shoot-out occurred, that their victims were federal agents. The appellants argue that, under *United States v. Danehy,* 680 F.2d 1311 (11th Cir.1982), the court's refusal to give such an instruction requires the reversal of their murder and assault convictions.

#### 1. *The Appellants' Requested Instruction*

The appellants alleged at trial that they mistakenly believed that the undercover agents were members of the Mafia, and that the shootings of Agents Rios and D'Atri were in self-defense.[10] At the

---

**8.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

**9.** The appellants contend that, because 18 U.S.C. § 1114 does not explicitly mention BATF agents, the principle of lenity requires the reversal of their murder and assault convictions. This argument is foreclosed by the former Fifth Circuit decision in *Irick.* The *Irick* court noted that the principle of lenity does not require that other pertinent statutes, such as 5 U.S.C. § 907(a), be disregarded. 497 F.2d at 1373. Furthermore, the court pointed out that 5 U.S.C. § 907(a) existed at the time the crime was committed, providing the defendant with fair warning of the prohibited conduct. *Id.* The court therefore refused to reverse the defendant's conviction simply because 18 U.S.C. § 1114 did not explicitly mention the particular federal agency with which the victim was employed. The same rationale governs the instant case.

The appellants also contend that 5 U.S.C. § 907(a) was intended to apply only to civil, and not to criminal, statutes. The *Irick* court expressly rejected this contention as well. *Id.*

**10.** Simon testified that he thought that the agents were members of the Mafia, and that he was afraid of a rip-off. Simon also testified that, immediately prior to the shoot-out, he saw Agent Rios reach behind his back. According to Simon's testimony, he told Agent Rios to keep his hands in front of him. Agent Rios then looked toward Agent D'Atri, who immediately pulled his weapon and shouted, "F---king Cuban." Simon heard shooting and felt the shots hitting his body. He turned around to get his own gun but was grabbed from behind by Agent Rios, while Agent D'Atri continued to shoot him from the front. Suddenly, the shooting stopped and Simon tried to follow Alvarez out of the living room. He felt weak and reached into a closet for the carbine rifle to use as a crutch. He fell and was arrested.

Concepcion testified that, immediately before the shoot-out, Agent D'Atri began speaking in English "in an agitated manner." Concepcion testified that he did not understand what was happening, but that he heard Simon say, "Take your hand out." According to Concepcion's testimony, he then saw Agent D'Atri reach behind his back as if he was reaching for a gun. Concepcion threw himself on the ground, crawled to a window, and threw himself out the window. He was arrested outside the motel.

charge conference, counsel for the appellants requested the following instruction as to the assault count, Count IV:[11]

That to establish the offense of assaulting a federal officer in the performance of his official duties as charged in the indictment there are four essential elements which must be proved beyond a reasonable doubt:

First, that the defendant forcibly assaulted with [sic] any federal officer described in the indictment.

Second, that the individuals were federal officers then engaged in the performance of their official duties as charged.

Third, that the defendant did such acts willingly.

Fourth, that they did it knowingly.

The court refused to give this instruction because of the inclusion of the fourth, or "knowledge," element. The appellants now contend that, under *Danehy*, the court erred when it refused to give this instruction. In our view, this contention reflects a basic misunderstanding of *Danehy* and the federal assault statute, 18 U.S.C. § 111.

 Knowledge of the victim's status as a federal officer is not an element of the federal crime of assault under 18 U.S.C. § 111. *See United States v. Feola*, 420

U.S. 671, 684, 95 S.Ct. 1255, 1264, 43 L.Ed.2d 541 (1975); *United States v. Young*, 464 F.2d 160, 163 (5th Cir.1972); *Bennett v. United States*, 285 F.2d 567, 570–71 (5th Cir.1960), *cert. denied*, 366 U.S. 911, 81 S.Ct. 1087, 6 L.Ed.2d 236 (1961). As the Supreme Court stated in *Feola:*

[I]n order to effectuate the congressional purpose of according maximum protection to federal officers by making prosecution for assaults upon them cognizable in the federal courts, § 111 cannot be construed as embodying an unexpressed requirement that an assailant be aware that his victim is a federal officer. All the statute requires is an intent to assault, not an intent to assault a federal officer. A contrary conclusion would give insufficient protection to the agent enforcing an unpopular law, and none to the agent acting under cover.

420 U.S. at 684, 95 S.Ct. at 1264 (footnote omitted).

 Of course, it is a well-established proposition of federal criminal law that, when a defendant presents evidence in support of a claim of self-defense, the absence of self-defense must be proven beyond a reasonable doubt by the government.[12] *See United States v. Jackson*, 569 F.2d 1003, 1008 n. 12 (7th Cir.), *cert. denied*, 437

---

**11.** The appellants' requested instruction related only to the assault count, Count IV, and not to the murder count, Count III. Nevertheless, our discussion of the relevance of "knowledge" under the federal assault statute, 18 U.S.C. § 111, also applies to the federal murder statute, 18 U.S.C. § 1111(a). *Cf. United States v. Feola*, 420 U.S. 671, 684 n. 18, 95 S.Ct. 1255, 1264 n. 18, 43 L.Ed.2d 541 (1975) (Congress did not intend to treat assaults and homicides on federal officers differently); *McNabb v. United States*, 123 F.2d 848, 855 (6th Cir.1941) ("To be amenable to punishment under [18 U.S.C. § 452, the predecessor to 18 U.S.C. § 1111(a)], the killer need not know that he is killing an officer, agent or employee of the United States. The ingredient of the crime condemned is the unlawful killing of a human being...."), *rev'd on other grounds*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943).

**12.** As a matter of federal constitutional law, the government must prove beyond a reasonable doubt all elements of the crime charged, even where the defendant presents no evidence tending to negate the existence of the element. *See Patterson v. New York*, 432 U.S. 197, 211, 97

S.Ct. 2319, 2327, 53 L.Ed.2d 281 (1977); *Mullaney v. Wilbur*, 421 U.S. 684, 704, 95 S.Ct. 1881, 1892, 44 L.Ed.2d 508 (1975). Other issues, characterized as "affirmative defenses," must first be raised by the defendant; it is said that the defendant bears the "burden of production." *See Patterson*, 432 U.S. at 230–31 & n. 18, 97 S.Ct. at 2337–38 n. 18 (Powell, J., dissenting). The ultimate "burden of persuasion," however, may fall on either the government or the defendant, as determined by statute or court decision. *See id.* at 210–11, 97 S.Ct. at 2327–28.

Employing the above terminology, the absence of self-defense is not an element of the crime. Rather, self-defense is an affirmative defense on which the defendant bears the burden of production. *See id.* at 231 n. 18, 97 S.Ct. at 2338 n. 18 (Powell, J., dissenting). In a federal prosecution, however, once the defendant has met the burden of production, the government must satisfy the burden of persuasion and must negate self-defense beyond a reasonable doubt.

U.S. 907, 98 S.Ct. 3096, 57 L.Ed.2d 1137 (1978); *United States v. Corrigan*, 548 F.2d 879, 883 (10th Cir.1977); *United States v. Johnson*, 542 F.2d 230, 233 n. 4 (5th Cir.1976); *Frank v. United States*, 42 F.2d 623, 629 (9th Cir.1930); *see also Davis v. United States*, 160 U.S. 469, 488, 16 S.Ct. 353, 358, 40 L.Ed. 499 (1895) (burden of proof on government with respect to defendant's sanity). Accordingly, the *Feola* Court emphasized that, in certain circumstances, the defendant's state of knowledge may become relevant to a prosecution under 18 U.S.C. § 111:

> We are not to be understood as implying that the defendant's state of knowledge is never a relevant consideration under § 111. The statute does require a criminal intent, and there may well be circumstances in which ignorance of the official status of the person assaulted or resisted negates the very existence of *mens rea.* For example, where an officer fails to identify himself or his purpose, his conduct in certain circumstances might reasonably be interpreted as the unlawful use of force directed either at the defendant or his property. In a situation of that kind, one might be justified in exerting an element of resistance, and an honest mistake of fact would not be consistent with criminal intent.

420 U.S. at 686, 95 S.Ct. at 1264 (footnote omitted).

Nevertheless, even a claim of self-defense based on lack of knowledge of the victim's federal status does not make knowledge an element of the crime under section 111. When such a claim of self-defense arises in a section 111 case, the government may attempt to negate the claim by proving that the defendant knew of the victim's federal status. *See, e.g., United States v. Ochoa*, 526 F.2d 1278 (5th Cir.1976). That is not, however, the only way in which the government can negate such a claim of self-defense. For example, the government can do so by proving that the defendant was the aggressor or used excessive force:

[W]here a defendant charged with violating § 111 claims that he was unaware that the victim was a federal officer, the question becomes: would the defendant have been justified, because of the agent's actions, in using force against the agent had the latter, in fact, been a "civilian." If the defendant made an honest mistake of fact with respect to the agent's status *and* the defendant's use of force would have been justified against a private citizen, *then* he cannot be held criminally liable under § 111.... If ... the defendant would not have been justified in using force against a private citizen or if the defendant used more force than the law permitted, *see United States v. Perkins*, [488 F.2d 652, 654–55 (1st Cir.1973)], his mistake as to the agent's status would be no defense to an action under § 111.

*United States v. Hillsman*, 522 F.2d 454, 460 (7th Cir.) (emphasis added), *cert. denied*, 423 U.S. 1035, 96 S.Ct. 570, 46 L.Ed.2d 410 (1975).

Our decisions in *Danehy* and *United States v. Young*, 464 F.2d 160 (5th Cir. 1972), are consistent with these general rules. We did not hold in those two cases that the government was required to prove that the defendant knew of the victim's federal status. On the contrary, in *Danehy*, we emphasized that proof of such knowledge is merely one of the government's options:

> [T]he all-important point [is] that in a prosecution under 18 U.S.C. § 111 the defendant must *either* (1) know the person he is impeding is a federal officer *or* (2) engage in conduct towards that individual which would constitute a crime even if he were not a federal officer.

680 F.2d at 1315 (emphasis added).

Although some of the language in *Danehy* and *Young* may have engendered unnecessary confusion on this issue, we find that language to be no more than an attempt to tailor the standard self-defense instruction to the factual circumstances

present in those two cases. For example, in *Young*, we held:

> [T]he jury should have been clearly instructed that it could not find Young guilty of the offenses charged unless the jury believed that Young intended to threaten or attempted to injure [the federal agents]; and that Young could not intend to threaten or attempt to injure [the agents] if Young acted out of a reasonable belief that [the agents] were strangers who intended to inflict harm upon Young. . . .

464 F.2d at 163. Our suggested instruction in *Young* did not purport to make knowledge an element of the crime; instead, it simply restated the law of self-defense in terms applicable to the facts of the case.[13] The instruction we proposed in *Danehy* was identical to the one in *Young*. See *Danehy*, 680 F.2d at 1315.[14]

We acknowledge the possibility that, upon some extraordinary set of facts, the government might be required to prove that the defendant knew of the victim's federal status in order to obtain a conviction under 18 U.S.C. § 111. For example, if the undisputed evidence showed that the federal agent was the aggressor, and that the defendant used a reasonable amount of force in response, then the government might be able to negate the defendant's claim of self-defense *only* by proving that the defendant knew that his victim was a federal agent. In such a case, an instruction similar to the one here requested by the appellants might be proper. This is not, however, such a case. Here, the government was not required to prove the appellants' knowledge of their victims' identities in order to negate the appellants'

---

**13.** The proposed instruction in *Young* did not include one of the essential elements of a claim of self-defense, namely, that a defendant may use only the amount of force necessary to repel the attack. There was no need to instruct the jury about that element, however, because the undisputed evidence in the case clearly established that Young did not use excessive force. Young, a black man, was driving down a street in Jackson, Mississippi, when two white FBI agents in a government car attempted to arrest him. The agents drove alongside Young's car at speeds ranging from 15 to 30 miles per hour while one of the agents tried to display his badge and credentials. The agents then abruptly pulled in front of Young's car and stopped. As one of the agents stepped out to effect the arrest, Young drove his car into the right rear door of the government car. The agent was forced to jump back into the government car to avoid being hit by Young's car. Young was charged with assaulting a federal officer in violation of section 111. 464 F.2d at 161–62.

At trial, Young testified that he did not know who the two white men in the other car were, that he thought he was being harassed by local rowdies, and that he acted in self-defense. The government, on the other hand, argued that Young deliberately attempted to run down the agents. *Id.* at 162.

**14.** In *Danehy*, a Coast Guard vessel responding to a nighttime distress call encountered Danehy's boat in the Intracoastal Waterway north of Sarasota Bay. According to the government's version of the facts, the Coast Guardsmen inquired whether Danehy was overdue, but shortly thereafter broke off contact and continued traveling south. Later, as the Coast Guard ves-

sel returned northbound, Danehy attempted to ram the Coast Guard vessel. Danehy then circled the Coast Guard vessel, causing the vessel's motor to cavitate and stopping the vessel dead in the water. Danehy again attempted to ram the Coast Guard vessel, turning away only when the Coast Guardsmen displayed their weapons. When Danehy subsequently ran aground, the Coast Guardsmen were able to board Danehy's boat and arrest Danehy and his passengers. Danehy forcibly resisted arrest and had to be carried off his boat. He was charged with violating section 111. 680 F.2d at 1313.

Danehy's version of the facts differed greatly from the government's version. According to Danehy, no conversation took place between the Coast Guardsmen and the people on Danehy's boat. Instead, Danehy and his passengers saw a small unlit vessel hovering in the shadows. Later, when the unidentified vessel closed quickly on Danehy's boat, Danehy became apprehensive and took evasive action in self-defense. He then tried to flee and ran aground. The Coast Guardsmen boarded Danehy's boat without warning or permission and with weapons drawn. Danehy was arrested, handcuffed, and forced to kneel on the deck of his boat. He passively resisted the Coast Guardsmen, believing his arrest to be unlawful, and was carried off the boat. *Id.*

Even accepting the government's version of the facts, Danehy did not use deadly force against the Coast Guardsmen. Therefore, as in *Young*, there was no need for the court to instruct the jury that a defendant acting in self-defense may use only the amount of force necessary to repel an attack.

claim of self-defense.[15] We therefore hold that the court below did not err by refusing to give the appellants' requested instruction.

### 2. *Plain Error*

The appellants also contend that, even if their requested instruction was improper, the jury charge given by the district court constituted plain error under *Danehy* and *Young.* The appellants' challenge relates to the following portion of the charge:

> It is not necessary to show that the defendant knew the person being forcibly assaulted was at the time a federal officer carrying out an official duty, so long as it is established beyond a reasonable doubt that the victim was in fact a federal officer acting in the course of his duty and that the defendant willfully committed forcible assault upon him.

It is true that, in *Danehy* and *Young,* we held that the district court committed plain error by including similar language in the jury charge. The appellants' argument, however, ignores the fundamental principle that, in determining the correctness of a jury charge, a reviewing court must examine the entire charge. *See United States v. Rackley,* 742 F.2d 1266, 1273 (11th Cir. 1984); *United States v. Abravaya,* 616 F.2d 250, 251 (5th Cir.1980). Such an examination reveals that, *viewed in its entirety,* the charge in the instant case differs significantly from the charges that were found to be plain error in *Danehy* and *Young.*[16]

In *Young,* the district court instructed the jury as follows:

> ... It is completely unimportant whether this defendant did or did not know that these men were FBI agents on such occasion. He didn't have to know that. Whether he knew it or not if he did what the government contends that he did whether he knew that they were agents at the time or not would make no difference as to whether he is guilty or innocent.
>
> . . . .
>
> An intentional or unlawful threat or attempt to commit injury upon the person of another when coupled with an apparent present ability so to do and an intentional display of force such as to place the victim in reasonable apprehension of immediate bodily harm constitutes an assault. An assault may be committed without actually touching, striking or committing bodily harm to another.
>
> . . . .
>
> Unlawfully as used in this instruction means either contrary to law or without legal justification; thus a person who in fact has the present ability to inflict bodily harm upon another, wilfully threatens or attempts to inflict bodily harm upon such person. may be found guilty of forcefully assaulting such person.
>
> The essential elements required to be proved in order to establish the offense charged in the indictment are first the act or acts of forcefully assaulting an agent of the Federal Bureau of Investigation while the agent was engaged in the performance of his official duties as charged, and second, such act or acts wilfully which means with bad purpose to disregard the law.
>
> . . . .

---

15. Several government witnesses testified that the agents who converged on the motel loudly announced their presence and identity. The government therefore argued that the appellants knew, or should have known, the identity of the agents inside the motel immediately prior to the shoot-out.

The government also attempted to establish, however, through Agent D'Atri's testimony, that the appellants, and not the agents inside the motel, were the aggressors and initiated the shoot-out. If the jury believed Agent D'Atri's testimony, then the appellants could have been convicted even though they did not know the identity of their victims.

16. Although in general we would limit our examination of the jury charge to the particular count of the indictment at issue, in the instant case the murder and assault counts are so factually intertwined that the instructions relating to both of those counts must be considered together.

Knowledge of the identity or official character of the person assaulted is not an essential element of the offense. If the defendant assaults a federal officer in order to be guilty it will not be necessary that the defendant should know that they were federal officers to be guilty of the offense charged.

464 F.2d at 162–63. We explained that these instructions "permit[ted] the jury to find Young guilty of the offenses charged even if the jury believed Young's testimony that he thought he was being harassed by local rowdies," *id.* at 163, and held that the jury charge as a whole constituted plain error, *id.* at 164.

In *Danehy*, the district court gave the following instruction:

It is not necessary to show that the defendant knew the people being forcibly resisted, opposed, impeded, or interfered with were, at that time, Federal officers carrying out an official duty; so long as it is established beyond a reasonable doubt that the victims were, in fact, Federal officers acting in the course of their duty and that the defendant willfully resisted, opposed, impeded, or interfered with them.

680 F.2d at 1315. Relying on *Young*, we again held that the jury charge as a whole constituted plain error. *Danehy*, 680 F.2d at 1315.

A crucial factor in *Young*, however, was that the district court failed properly to instruct the jury on the elements of self-defense. The government argued on appeal that the definition of "unlawfully" as "either contrary to law or without legal justification" served as an effective substitute for a self-defense instruction, and thereby "remove[d] the sting from the [improper] portion of the charge." *Young*, 464 F.2d at 164. We rejected the government's argument on the grounds that a single brief reference to "legal justification" could not alter the fact that, "[a]t best, the charge was confusing and contradictory":

We conclude that the charge, *considered as a whole*, failed "to define with substantial particularity the factual issues," and failed "clearly to instruct the jurors as to the principles of law ... to apply in deciding the factual issues involved in the case before them." *United States v. Hill*, 5 Cir.1969, 417 F.2d 279, 281. The failure to instruct properly on the issue of intention effectively deprived Young of his right "to have presented instructions relating to a theory of defense for which there is any foundation in the evidence." *Perez v. United States*, 5 Cir.1961, 297 F.2d 12, 14–15.

*Id.* (emphasis added).[17]

Here, in sharp contrast to *Young*, the district court gave the jury a complete and accurate self-defense instruction. After explaining the elements of first and second degree murder, the court charged the jury:

If the defendant was not the aggressor and had reasonable grounds to believe and actually did believe that he was in imminent danger of death or serious bodily harm from which he could save himself only by using deadly force against his assailant, he had the right to employ deadly force in order to defend himself.

By deadly force is meant force which is likely to cause death or serious bodily harm.

In order for the defendant to have been justified in the use of deadly force in self defense, he must not have provoked the assault on him or been the agressor [sic]. Mere words, without more, do not constitute provocation or aggression.

The circumstances under which he acted must have been such as to produce in the mind of a reasonably prudent person similarly situated the reasonable belief that the other person was then about to kill him or to do him serious bodily harm.

---

**17.** In *Danehy*, we did not discuss whether the district court properly instructed the jury on the elements of self-defense. Nevertheless, our holding in *Danehy* was premised on the conclusion that, as in *Young*, the entire jury charge did not provide the jury with a sufficient basis fairly to consider the defendant's claim of self-defense.

In addition, the defendant must actually believe that he was in imminent danger of death or serious bodily harm and that deadly force must be used to repel it.

If evidence of self defense is present, the government must prove beyond a reasonable doubt that the defendant did not act in self defense.

If you find that the government has failed to prove beyond a reasonable doubt that the defendant did not act in self defense, you must find the defendant not guilty. In other words, if you have a reasonable doubt whether or not the defendant acted in self defense, your verdict must be not guilty.

We conclude that this lengthy self-defense instruction provided the appellants with an adequate basis for arguing their theory of the case to the jury. Unlike in *Young*, the jury charge in the instant case, *viewed in its entirety*, did not deprive the appellants of the right "to have presented instructions relating to a theory of defense for which there is any foundation in the evidence." 464 F.2d at 164.[18] While we do not condone the district court's failure to follow the course we set out in *Danehy* and *Young*, we hold that, because the self-defense instruction cured much of the potential harm caused by the improper "knowledge" instruction,[19] the jury charge as a whole did not constitute plain error.

 We take this opportunity to reemphasize, however, that when a defendant in a prosecution under 18 U.S.C. §§ 111 or 1111(a)[20] raises a claim of self-defense based on lack of knowledge that the victim was a federal agent, the jury should be instructed about the relevance of the defendant's state of knowledge. As discussed in the preceding section, the government may negate such a claim of self-defense *either* by proving that the defendant knew of the victim's federal status *or* by proving that the defendant's conduct would not have qualified as self-defense even against a private citizen. The jury charge in such a case, therefore, should include (1) an explanation of the essential elements of a claim of self-defense, and (2) an instruction informing the jury that the defendant cannot be convicted *unless* the government proves, beyond a reasonable doubt, *either* (a) that the defendant knew that the victim was a federal agent, *or* (b) that the defendant's use of deadly force would not have qualified as self-defense even if the agent had, in fact, been a private citizen.

C. *Were the Murder Convictions of Portal, Concepcion, and Hernandez Proper Under Pinkerton v. United States?*

Appellants Portal, Concepcion, and Hernandez contend that their murder convictions under Count III were based on an unprecedented and improper extension of *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Under *Pinkerton*, each member of a conspiracy is criminally liable for any crime committed by a coconspirator during the course and in furtherance of the conspiracy, unless the crime "did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *Id.* at 647–48, 66 S.Ct. at 1184; *United States v. Johnson*, 730 F.2d 683, 690 (11th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 186, 83 L.Ed.2d 119 (1984); *United States v. Moreno*, 588 F.2d 490, 493

---

**18.** Nor did the jury charge in the instant case "eliminate[ ] the key specific ground on which [the appellants] denied the wilfulness of [their] conduct." *Young,* 464 F.2d at 164 (footnote omitted).

**19.** In fact, the combination of the self-defense instruction and the improper "knowledge" instruction may have helped, rather than hurt, the appellants' chances for an acquittal. The jury was never told that, if the appellants knew that their victim was a federal agent, then the appellants' claim of self-defense must fail. In other words, the jury might well have operated under the mistaken belief that the appellants lawfully could have shot Agents Rios and D'Atri *even if the appellants knew* that the two men were federal agents.

**20.** *See supra* note 11.

(5th Cir.), *cert. denied*, 441 U.S. 936, 947, 99 S.Ct. 2061, 2168, 60 L.Ed.2d 666, 1049 (1979). The three appellants argue that murder is not a reasonably foreseeable consequence of a drug conspiracy, and that their murder convictions therefore should be reversed. We conclude that, although the murder convictions of the three appellants may represent an unprecedented application of *Pinkerton*, such an application is not improper.[21]

### 1. *Standard of Review*

■ We note initially that the scope of our review is limited. The application of the *Pinkerton* doctrine to a particular set of facts ultimately is for the jury to decide. *See Nye & Nissen v. United States*, 336 U.S. 613, 618, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949). In the instant case, the district court submitted the murder count to the jury with a proper *Pinkerton* instruction,[22] and the jury found the three appellants guilty of murder. We must determine whether the court erred in deciding to submit the *Pinkerton* issue to the jury. Our standard of review is whether the evidence was sufficient for a reasonable jury to have concluded, beyond a reasonable doubt, that the murder was a reasonably foreseeable consequence of the drug conspiracy alleged in the indictment. *See United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B

1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).[23] In making this assessment, we must view the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and accept all reasonable inferences and credibility choices made by the jury, *United States v. Gonzalez*, 719 F.2d 1516, 1521–22 (11th Cir. 1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1312, 79 L.Ed.2d 710 (1984).

### 2. *Reasonable Foreseeability*

■ Upon reviewing the record, we find ample evidence to support the jury's conclusion that the murder was a reasonably foreseeable consequence of the drug conspiracy alleged in the indictment. In making this determination, we rely on two critical factors. First, the evidence clearly established that the drug conspiracy was designed to effectuate the sale of a large quantity of cocaine. The conspirators agreed to sell Agents Rios and D'Atri three kilograms of cocaine for a total price of $147,000. The transaction that led to the murder involved the sale of one kilogram of cocaine for $49,000. In short, the drug conspiracy was no nickel-and-dime operation; under any standards, the amount of drugs and money involved was quite substantial.

**21.** The three appellants also contend that their assault convictions were based on an improper application of the *Pinkerton* doctrine. Because drug conspiracies result in assaults at least as frequently as they result in murders, if not more so, our conclusion that murder is a reasonably foreseeable consequence of a drug conspiracy necessarily forecloses the appellants' argument with respect to the assault convictions.

**22.** The jury was instructed:

If you find that a particular defendant is guilty of conspiracy as charged in Count I of the indictment, you may also find the defendant guilty of either murder as charged in Count III of the indictment or assault as charged in Count IV of the indictment, or both, provided you find the essential elements of murder or assault or both as defined in these instructions have been established beyond a reasonable doubt; and provided you also find beyond a reasonable doubt:

First, that the murder or assault or both were committed pursuant to the conspiracy;

Second, that the murder or assault or both were reasonably foreseeable consequences of the conspiracy alleged in Count I; and

Three, that the particular defendant was a member of the conspiracy at the time of the murder or assault or both was committed.

Under the conditions just defined a defendant may be found guilty of a substantive count even though he did not participate in the murder or assault or both.

The reason for this is that a coconspirator committing a substantive offense pursuant to a conspiracy is held to be the agent of other conspirators as to acts which are reasonably foreseeable.

**23.** Decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981, are binding precedent in this circuit. *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982).

Second, based on the amount of drugs and money involved, the jury was entitled to infer that, at the time the cocaine sale was arranged, the conspirators must have been aware of the likelihood (1) that at least some of their number would be carrying weapons, and (2) that deadly force would be used, if necessary, to protect the conspirators' interests. We have previously acknowledged the "nexus" between weapons and drugs, *see United States v. Montes-Cardenas*, 746 F.2d 771, 776 (11th Cir.1984), and we have also recognized that weapons have become "tools of the trade" for those involved in the distribution of illicit drugs, *id.* at 777. As the former Fifth Circuit has stated, "Experience on the trial and appellate benches has taught that substantial dealers in narcotics keep firearms on their premises as tools of the trade almost to the same extent as they keep scales, glassine bags, cutting equipment, and other narcotic equipment." *United States v. Perez*, 648 F.2d 219, 224 (5th Cir. Unit B) (quoting *United States v. Wiener*, 534 F.2d 15, 18 (2d Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976)), *cert. denied*, 454 U.S. 1055, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981); *see also United States v. Lippner*, 676 F.2d 456, 463 (11th Cir.1982) (gun and brass knuckles admissible in drug conspiracy trial because they were "tools for the execution of the crime"). In light of these observations, and in view of the amount of drugs and money involved in the instant case, the jury's inference was both reasonable and proper.

In our opinion, these two critical factors provided ample support for the jury's conclusion that the murder was a reasonably foreseeable consequence of the drug conspiracy alleged in the indictment. In addition, we note the evidence at trial indicating that at least two of the conspirators were extremely nervous about the possibility of a rip-off or a drug bust. During a lull in the negotiations, Alvarez observed, "In this business, you have to be careful. It's a dangerous business. You have to watch out for rip-offs and Federal agents." Alvarez also stated that he would never go back to prison, and that he would rather be dead than go back to prison. Alvarez' statements clearly implied that he contemplated the use of deadly force, if necessary, to avoid a rip-off or apprehension by Federal agents. The evidence also indicated that, immediately prior to the shoot-out, Simon looked nervously out the window while fidgeting with a leather pouch that was suspected to contain a weapon. The jury properly could take this additional evidence into account in reaching its conclusion about the foreseeability of the murder.

Because we find that the evidence in this case was more than sufficient to allow a reasonable jury to conclude that the murder was a reasonably foreseeable consequence of the drug conspiracy alleged in the indictment, we hold that the court did not err by submitting the *Pinkerton* issue to the jury.

### 3. *Individual Culpability*

The three appellants also contend that, even if the murder was reasonably foreseeable, their murder convictions nevertheless should be reversed. The appellants argue that the murder was sufficiently distinct from the intended purposes of the drug conspiracy, and that their individual roles in the conspiracy were sufficiently minor, that they should not be held responsible for the murder. We are not persuaded.

It is well established that, under the *Pinkerton* doctrine, "[a] co-conspirator is vicariously liable for the acts of another co-conspirator even though he may not have directly participated in those acts, his role in the crime was minor, or the evidence against a co-defendant more damaging." *United States v. Gagnon*, 721 F.2d 672, 676 (9th Cir.1983); *see United States v. Monaco*, 702 F.2d 860, 881 n. 38 (11th Cir. 1983); *United States v. Poitier*, 623 F.2d 1017, 1023 (5th Cir.1980). Thus, in a typical *Pinkerton* case, the court need not inquire into the individual culpability of a particular conspirator, so long as the sub-

stantive crime was a reasonably foreseeable consequence of the conspiracy.[24]

We acknowledge that the instant case is not a typical *Pinkerton* case. Here, the murder of Agent Rios was not within the originally intended scope of the conspiracy, but instead occurred as a result of an unintended turn of events. We have not found, nor has the government cited, any authority for the proposition that all conspirators, regardless of individual culpability, may be held responsible under *Pinkerton* for reasonably foreseeable but originally unin-

tended substantive crimes.[25] Furthermore, we are mindful of the potential due process limitations on the *Pinkerton* doctrine in cases involving attenuated relationships between the conspirator and the substantive crime.[26]

Nevertheless, these considerations do not require us to reverse the murder convictions of Portal, Concepcion, and Hernandez, for we cannot accept the three appellants' assessment of their individual culpability. All three were more than "minor"

---

24. A typical *Pinkerton* case falls into one of two categories. The first and most common category includes cases in which the substantive crime that is the subject of the *Pinkerton* charge is also one of the primary goals of the alleged conspiracy. *See, e.g., United States v. Luis-Gonzalez,* 719 F.2d 1539, 1545 n. 4 (11th Cir.1983) (conspiracy to possess with intent to distribute marijuana; substantive crime of possession of marijuana); *United States v. Harris,* 713 F.2d 623, 626 (11th Cir.1983) (conspiracy to distribute cocaine; substantive crimes of possession and distribution of cocaine); *United States v. Tilton,* 610 F.2d 302, 309 (5th Cir.1980) (conspiracy to commit mail fraud; substantive crime of mail fraud).

The second category includes cases in which the substantive crime is not a primary goal of the alleged conspiracy, but directly facilitates the achievement of one of the primary goals. *See, e.g., Shockley v. United States,* 166 F.2d 704, 715 (9th Cir.) (conspiracy to escape by violent means from federal penitentiary; substantive crime of first degree murder of prison guard), *cert. denied,* 334 U.S. 850, 68 S.Ct. 1502, 92 L.Ed. 1773 (1948); *United States v. Brant,* 448 F.Supp. 781, 782 (W.D.Pa.1978) (narcotics conspiracy; substantive crime of possession of a firearm during commission of a felony).

In either of these two categories, *Pinkerton* liability can be imposed on all conspirators because the substantive crime is squarely within the intended scope of the conspiracy.

25. The imposition of *Pinkerton* liability for such crimes is not wholly unprecedented. *See, e.g., Government of Virgin Islands v. Dowling,* 633 F.2d 660, 666 (3d Cir.) (conspiracy to commit bank robbery; substantive crime of assault with deadly weapons against police officers, committed during escape attempt), *cert. denied,* 449 U.S. 960, 101 S.Ct. 374, 66 L.Ed.2d 228 (1980); *Park v. Huff,* 506 F.2d 849, 859 (5th Cir.) (liquor conspiracy; substantive crime of first degree murder of local district attorney, committed in attempt to stop investigation of illegal liquor sales), *cert. denied,* 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975). In each of the aforementioned cases, however, vicarious liability was

imposed only on "major" participants in the conspiracy.

At trial in the instant case, the government's attorney argued that *Pinkerton* liability for Agent Rios' murder properly could be imposed on all of the conspirators, and expressed the view that prosecutorial discretion would protect truly "minor" participants, such as appellants Rios and Raymond, from liability for the far more serious crimes committed by their coconspirators. We do not find this argument persuasive. In our view, the liability of such "minor" participants must rest on a more substantial foundation than the mere whim of the prosecutor.

26. *See United States v. Johnson,* 730 F.2d 683, 690 n. 8 (11th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 186, 83 L.Ed.2d 119 (1984); *United States v. Moreno,* 588 F.2d 490, 493 (5th Cir.), *cert. denied,* 441 U.S. 936, 947, 99 S.Ct. 2061, 2168, 60 L.Ed.2d 666, 1049 (1979). We also note the observations of Judge Mansfield of the Second Circuit who, in discussing the analogous issue of aider-and-abettor liability, stated:

> [I]t seems to me to place an undue strain on the concept to reason that, once a general conspiracy is shown, a minor or subordinate member who commits some act in furtherance of it thereby becomes an aider and abettor of parallel conduct of which he was unaware on the part of another member whose existence is unknown to him, merely because he should have reasonably foreseen that his conduct might assist others to commit such acts. Although such a foreseeability test might provide a basis for tort liability, the relationship strikes me as too attenuated to support a criminal conviction on the theory of aiding and abetting.

*United States v. Blitz,* 533 F.2d 1329, 1346–47 (2d Cir.) (Mansfield, J., dissenting) (citations omitted), *cert. denied,* 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 79 (1976). Judge Mansfield acknowledged that the conviction in *Blitz* could have been upheld under the *Pinkerton* doctrine, but he strongly intimated that he would have disagreed with such a result as well. *See id.* at 1347.

participants in the drug conspiracy. Portal served as a look-out in front of the Hurricane Motel during part of the negotiations that led to the shoot-out, and the evidence indicated that he was armed. Concepcion introduced the agents to Alvarez, the apparent leader of the conspiracy, and was present when the shoot-out started. Finally, Hernandez, the manager of the motel, allowed the drug transactions to take place on the premises and acted as a translator during part of the negotiations that led to the shoot-out.

In addition, all three appellants had actual knowledge of at least some of the circumstances and events leading up to the murder. The evidence that Portal was carrying a weapon demonstrated that he anticipated the possible use of deadly force to protect the conspirators' interests. Moreover, both Concepcion and Hernandez were present when Alvarez stated that he would rather be dead than go back to prison, indicating that they, too, were aware that deadly force might be used to prevent apprehension by Federal agents.

We find the individual culpability of Portal, Concepcion, and Hernandez sufficient to support their murder convictions under *Pinkerton*, despite the fact that the murder was not within the originally intended scope of the conspiracy. In addition, based on the same evidence, we conclude that the relationship between the three appellants and the murder was not so attenuated as to run afoul of the potential due process limitations on the *Pinkerton* doctrine. We

therefore hold that *Pinkerton* liability for the murder of Agent Rios properly was imposed on the three appellants, and we decline to reverse their murder convictions on this ground.[27]

### D. Did the District Court Err By Giving the Lesser-Included Offense Instruction In Connection With Count III?

Appellants Portal, Concepcion, and Hernandez contend that the district court erred by giving a lesser-included offense instruction in connection with the murder charges in Count III of the indictment. The lesser-included offense instruction defined the elements of second degree murder. The three appellants argue that, under the *Pinkerton* doctrine, the jury had only two legitimate options: it could find them guilty of the crime committed by their coconspirators, or it could acquit them. The appellants claim that the lesser-included offense instruction allowed the jury to reach an improper compromise verdict. We find this contention meritless.

The Federal Rules of Criminal Procedure provide that a defendant "may be found guilty of an offense necessarily included in the offense charged ...." Fed.R.Crim.P. 31(c). In the instant case, the court decided to give the lesser-included offense instruction because the evidence at trial could have supported the conclusion that the shot that killed Agent Rios was fired without premeditation.[28] Failure to give

---

**27.** Although our decision today extends the *Pinkerton* doctrine to cases involving reasonably foreseeable but originally unintended substantive crimes, we emphasize that we do so only within narrow confines. Our holding is limited to conspirators who played more than a "minor" role in the conspiracy, or who had actual knowledge of at least some of the circumstances and events culminating in the reasonably foreseeable but originally unintended substantive crime.

**28.** The jury was instructed:
Premeditation, which must be proved in addition to malice aforethought in order to establish the offense of first degree murder, is typically associated with murder in cold blood and requires a period of time in which

the accused coldly deliberates or thinks the matter over before acting.

The necessary duration of the period cannot be arbitrarily fixed. The time required to form a deliberate plan or design varies as the minds and temperament of humans differ, and according to the surrounding circumstances in which they may be placed.

Any interval of time between the forming of the specific intent to kill and the execution of that intent which is of sufficient duration for the accused to be fully conscious and mindful of what he intended willfully to set about to do is sufficient to justify a finding of premeditation.

....

[I]f during your deliberations you find that a murder was committed but that the element

such a lesser-included offense instruction might well have constituted reversible error. *See Keeble v. United States,* 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844 (1973); *Sansone v. United States,* 380 U.S. 343, 349, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1965). The lesser-included offense instruction was requested by the government and by appellants Alvarez and Simon, but the court properly could have given the instruction even without a request and over the objections of all of the appellants. *See United States v. Iron Shield,* 697 F.2d 845, 848 (8th Cir.1983). We must therefore reject the contention of appellants Portal, Concepcion, and Hernandez that the lesser-included offense instruction should not have been given. *See United States v. Bey,* 667 F.2d 7, 11 (5th Cir. Unit B 1982) ("If the lesser included offense was supportable by the evidence, then the defendants have no ground for objection under Rule 31(c).").

The actual basis for the three appellants' claim of error seems to be not the lesser-included offense instruction itself, but the fact that the jury was allowed to return an inconsistent or "compromise" verdict finding them guilty of second degree murder while finding Alvarez and Simon guilty of first degree murder. Inconsistency in a verdict, however, is not a sufficient reason to set it aside. *See United States v. Powell,* —— U.S. ——, 105 S.Ct. 471, 476–79, 83 L.Ed.2d 461 (1984); *Harris v. Rivera,* 454 U.S. 339, 345, 102 S.Ct. 460, 464, 70 L.Ed.2d 530 (1981). As the Supreme Court has stated:

> [W]here truly inconsistent verdicts have been reached, "[t]he most that can be said ... is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt."

*Powell,* 105 S.Ct. at 477 (quoting *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932)).

The Supreme Court has directly addressed the issue of inconsistent verdicts involving codefendants in a joint trial. In *United States v. Dotterweich,* 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943), a corporation and an individual who served as the corporation's president and general manager were jointly tried for violating the Federal Food, Drug, and Cosmetic Act. The corporation was acquitted, but the individual, Dotterweich, was convicted. On appeal, Dotterweich argued, *inter alia,* that the jury's verdict was inconsistent. The Supreme Court rejected this argument:

> Equally baseless is the claim of Dotterweich that, having failed to find the corporation guilty, the jury could not find him guilty. Whether the jury's verdict was the result of carelessness or compromise or a belief that the responsible individual should suffer the penalty ... is immaterial. Juries may indulge in precisely such motives or vagaries.

*Id.* at 279, 64 S.Ct. at 135 (citing *Dunn,* 284 U.S. at 390, 52 S.Ct. at 190); *see United States v. Colson,* 662 F.2d 1389, 1393 (11th Cir.1981); *United States v. Kohlmann,* 491 F.2d 1250, 1253 (5th Cir.1974) ("[E]ven if we assume that the jury's verdict is inconsistent or is the result of a compromise, this is not cause for speculation or inquiry into the verdict on our part.").

In the instant case, the jury properly could have convicted Portal, Concepcion, and Hernandez of first degree murder under *Pinkerton,* but chose for some unknown reason not to do so. If anything, the three appellants benefited from this inconsistency in the jury's verdict. We see no reason to disturb the jury's verdict, and we reject the appellants' contention that the district court erred by giving the lesser-included offense instruction to the jury.

___

of premeditation was lacking or have a reasonable doubt as to whether the murder was committed with premeditation, then in that

event you should return a verdict of murder in the second degree.

### E. Was the Evidence Sufficient to Convict Appellants Rios, Raymond, Portal, and Hernandez of Conspiracy?

 Appellants Rios, Raymond, Portal, and Hernandez contend that the evidence presented at trial was insufficient to convict them of conspiracy under 21 U.S.C. § 846. To convict a defendant of participation in a drug conspiracy, the government must prove that a conspiracy existed, that the defendant knew of it, and that, with knowledge, the defendant voluntarily became a part of the conspiracy. *United States v. Rackley,* 742 F.2d 1266, 1272 (11th Cir.1984); *United States v. Bland,* 653 F.2d 989, 996 (5th Cir.), *cert. denied,* 454 U.S. 1055, 102 S.Ct. 602, 70 L.Ed.2d 592 (1981). In the instant case, the four appellants do not deny that a conspiracy existed; rather, they contend that the government failed to prove that each of them knowingly participated in the conspiracy.

We note that the government need not prove that a defendant had knowledge of all details or phases of the conspiracy. Rather, it is enough that the defendant knew the essential nature of the conspiracy. *Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947); *United States v. James,* 528 F.2d 999, 1011 (5th Cir.), *cert. denied,* 429 U.S. 959, 97 S.Ct. 382, 50 L.Ed.2d 326 (1976). Furthermore, direct evidence of the elements of a conspiracy is not required. A defendant's knowing participation in the conspiracy may be established through proof of surrounding circumstances, such as acts committed by the defendant that furthered the purpose of the conspiracy. *United States v. Bain,* 736 F.2d 1480, 1485 (11th Cir. 1984); *see also United States v. Garcia,* 721 F.2d 721, 725 (11th Cir.1983) ("A defendant's involvement as a conspirator may be shown through knowledge of the conspiracy and association with coconspirators combined with other circumstantial evidence.").

### 1. Appellant Rios

 The evidence at trial established that appellant Rios was present at the meeting with the undercover BATF agents at the convenience store parking lot on December 1, 1982. The purpose of this meeting was to negotiate the sale of two kilograms of cocaine. Raymond told the agents, in appellant Rios' presence, that Raymond had obtained a source for the cocaine. After Raymond tried to contact the source, Agent Tirado asked appellant Rios if he knew when the cocaine would be delivered. Appellant Rios then attempted to telephone the cocaine source and, when the attempt proved unsuccessful, led Agents Rios and Tirado to the source's residence. Finally, appellant Rios returned to the parking lot and was present when Portal arrived and arranged to sell two kilograms of cocaine to the agents.

In our opinion, this evidence was sufficient for a reasonable jury to conclude, beyond a reasonable doubt, that appellant Rios had knowledge of the essential nature of the conspiracy. Furthermore, the jury could properly infer, from the circumstances surrounding the meeting and the actions of appellant Rios, that he knowingly participated in the conspiracy. We therefore hold that the evidence was sufficient to convict appellant Rios of conspiracy under 21 U.S.C. § 846.

### 2. Appellant Raymond

 The evidence at trial established that Raymond also was present at the meeting in the convenience store parking lot. Raymond told the agents that he had obtained a source for the cocaine, but that delivery would be delayed by about a half hour. Raymond then unsuccessfully attempted to telephone his cocaine source. Several times, Raymond assured the undercover BATF agents that the cocaine was coming, and asked the agents to wait a little while longer. At one point, Raymond suggested that the cocaine deal be moved across the street from the parking lot, because he thought that there were too many cars in the parking lot. Finally, Raymond was present when Portal arrived and ar-

ranged to sell two kilograms of cocaine to the agents.

We find the evidence against Raymond even more convincing than the evidence against appellant Rios. The evidence showed that Raymond was the initial cocaine contact, and it was Raymond who conducted most of the negotiations with the agents at the initial meeting. Hence the evidence was sufficient to convict Raymond of conspiracy under 21 U.S.C. § 846.

### 3. *Appellant Portal*

The evidence at trial established that Portal arrived at the parking lot on December 1, 1982, and spoke with appellants Rios and Raymond. Portal then told the undercover BATF agents that he could make immediate delivery of two kilograms of cocaine. After telephoning Concepcion, his cocaine source, Portal told the agents that he could obtain the cocaine by noon the next day. On December 2, 1982, the day of the shoot-out, Portal was present at the meeting with Concepcion and Agents Rios and D'Atri at the restaurant parking lot. At the conclusion of this meeting, Portal rode with Concepcion to the Hurricane Motel. Portal remained outside the motel, acting as a "lookout," and the evidence at trial indicated that he was armed. Finally, when the first meeting at the Hurricane Motel ended, Portal drove home to Homestead, Florida, in Concepcion's car.

This evidence was more than adequate for a reasonable jury to conclude, beyond a reasonable doubt, that appellant Portal knowingly participated in the conspiracy. We therefore hold that the evidence was sufficient to convict Portal of conspiracy under 21 U.S.C. § 846.

### 4. *Appellant Hernandez*

The evidence at trial established that Hernandez was the manager of the Hurricane Motel, and shared with Alvarez the apartment where the cocaine deal and the shoot-out occurred on December 2, 1982. Hernandez was present for much of the first meeting with the undercover BATF agents, Alvarez, and Concepcion.

Hernandez entered and left the room several times during the meeting, and acted as a translator for statements made in Spanish by Alvarez and in English by Agent D'Atri. At one point, Alvarez, in the presence of Hernandez, produced a sample of cocaine for D'Atri to test. When the agents became concerned about the delay in the delivery of the cocaine, Hernandez told them, "Don't worry, he's coming. If he says he's coming, he will be here." Finally, when Simon arrived, Hernandez announced, "He's here."

Hernandez contends that the evidence established nothing more than his "mere presence" at the scene of the crime, and therefore was insufficient to support his conviction for conspiracy. We do not find this contention persuasive. Although "mere presence," standing alone, will not support a conspiracy conviction, see *United States v. Sarro,* 742 F.2d 1286, 1298 (11th Cir.1984), presence is a factor to be considered with other evidence in evaluating the "totality of the circumstances," see *United States v. Blasco,* 702 F.2d 1315, 1332 (11th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 275, 276, 78 L.Ed.2d 256 (1983), by which a jury can determine whether a defendant is guilty of conspiracy. *United States v. Castro,* 723 F.2d 1527, 1534 (11th Cir.1984); see *United States v. Kincade,* 714 F.2d 1064, 1065 (11th Cir.1983) ("[P]resence is a material and probative factor which the jury may consider in reaching its decision."). In our view, the evidence in the instant case established much more than Hernandez' "mere presence."

The evidence at trial overwhelmingly supported the inference that Hernandez knew that his roommate, Alvarez, and the other men in the apartment were conducting a cocaine deal. In addition, as manager of the Hurricane Motel, Hernandez could have prevented the cocaine deal from taking place on the premises. His failure to do so allowed the jury to infer that he willingly provided the location for the consummation of the cocaine deal. Finally, Hernandez played an active role during the first meeting at the motel, acting as a

translator during part of the meeting and reassuring the agents that the cocaine source would arrive soon.

Based on the "totality of the circumstances," we find the evidence sufficient for a reasonable jury to conclude, beyond a reasonable doubt, that Hernandez was not simply an innocent bystander to the cocaine deal that took place at the Hurricane Motel on December 2, 1982, but knowingly participated in the conspiracy. Accordingly, we hold that the evidence was sufficient to convict Hernandez of conspiracy under 21 U.S.C. § 846.

F. *Did the District Court Err By Admitting Coconspirator Hearsay Statements Against Appellant Hernandez?*

 Hernandez contends that the district court erred by admitting certain coconspirator hearsay statements against him. Specifically, Hernandez challenges the admission of (1) the conversation between Hernandez, Alvarez, and Agent D'Atri concerning use of the telephone in the motel office, and (2) the conversation between Alvarez and Agents Rios and D'Atri, during which Alvarez said that he would never go back to prison. Hernandez contends that these statements were inadmissible under *United States v. James*, 590 F.2d 575 (5th Cir.) (en banc), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), and that the erroneous admission of the statements requires us to reverse his convictions. We reject this claim.

The test for admissibility of coconspirator hearsay is well established in this circuit. The hearsay statements will be admitted only if the government presents substantial, independent evidence demonstrating (1) the existence of a conspiracy, (2) that the defendant and the declarant were both members of the conspiracy, and (3) that the statement was made in the course of and in furtherance of the conspiracy. *United States v. Castro*, 723 F.2d 1527, 1532 (11th Cir.1984); *United States v. Yonn*, 702 F.2d 1341, 1348 (11th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 283, 78 L.Ed.2d 261 (1983); *James*, 590 F.2d at 581. A trial court's determination that the *James* standard has been satisfied is a finding of fact, subject to the "clearly erroneous" standard of review on appeal. *Yonn*, 702 F.2d at 1348; *United States v. Bulman*, 667 F.2d 1374, 1379 (11th Cir.), *cert. denied*, 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982).

Hernandez argues that the second prong of the admissibility test was not satisfied because there was insufficient independent evidence to demonstrate that he knowingly participated in the conspiracy. We conclude, however, that the district court's resolution of the admissibility issue was not "clearly erroneous." In fact, we completely agree with the district court's determination that Hernandez' knowing participation in the conspiracy was demonstrated by substantial, independent evidence. In our previous discussion of the sufficiency of the evidence, we recited the independent evidence that, in our opinion, amply demonstrated Hernandez' knowing participation.[29] On the basis of that previous dis-

---

29. Although the standard for sufficiency of the evidence is not identical to the *James* standard for admissibility of coconspirator hearsay statements, the two standards are sufficiently similar under the facts of this case to warrant reliance on our previous discussion. *See Castro*, 723 F.2d at 1535. There are two primary differences between the *James* standard and the sufficiency of the evidence standard, *see id.* at 1535 n. 7, but neither difference is relevant here. The first difference is that the *James* standard is applied only to the independent evidence, while the sufficiency of the evidence standard allows the reviewing court to rely on the admitted coconspirator hearsay statements. In our previous discussion of the sufficiency of the evi-

dence, however, we did not rely on any of the coconspirator hearsay statements. The second difference is that the *James* standard allows the district court to weigh and evaluate the credibility of the witnesses and other evidence, *see United States v. Perry*, 624 F.2d 29, 30 (5th Cir.1980), while the sufficiency of the evidence standard requires the reviewing court to view the evidence in the light most favorable to the government. In a case in which the two standards produce opposite results, this difference might become significant. *See Castro*, 723 F.2d at 1535 n. 7. Here, however, where the two standards produce the same result, we do not view this difference as significant.

cussion, we hold that the district court did not err by admitting the coconspirator hearsay statements against Hernandez, and we decline to reverse his convictions.

### G. Did the District Court Err By Refusing to Grant Appellant Portal's Motion for a Judgment of Acquittal Based on Entrapment?

 Portal contends that the weight of the evidence at trial supported his defense theory of entrapment, and that the government presented insufficient evidence to establish his predisposition to commit the crime of conspiracy to possess with intent to distribute cocaine. Portal therefore contends that the district court should have granted his motion for a judgment of acquittal based on entrapment. We disagree. Our review of the record satisfies us that the government presented sufficient evidence of Portal's predisposition, and we conclude that the district court did not err by submitting the issue of Portal's entrapment to the jury.

The rule in this circuit is that, "when entrapment is at issue, the focal point of the inquiry is on the predisposition of the defendant." *United States v. Dean,* 666 F.2d 174, 180 (5th Cir. Unit B 1982) (quoting *United States v. Webster,* 649 F.2d 346, 348 (5th Cir.1981) (en banc)), *cert. denied,* 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303, 457 U.S. 1135, 102 S.Ct. 2963, 73 L.Ed.2d 1353 (1983). To establish entrapment, the defendant must first present evidence of a prima facie case by showing that the government conduct created "a substantial risk that the offense would be committed by a person other than one ready to commit it." *Dean,* 666 F.2d at 180 (quoting *United States v. Tobias,* 662 F.2d 381, 384 (5th Cir.1981) (quoting *United States v. Mosley,* 496 F.2d 1012, 1014 (5th Cir.1974)), *cert. denied,* 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982)). If the defendant carries that burden, then the government must prove beyond a reason-

able doubt that the defendant was predisposed to commit the crime charged. *Dean,* 666 F.2d at 180; *Tobias,* 662 F.2d at 384; *United States v. Dickens,* 524 F.2d 441, 444 (5th Cir.1975), *cert. denied,* 425 U.S. 994, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976). The government may prove the defendant's predisposition by evidence of the defendant's conduct at or preceding the commission of the crime. *See Dickens,* 524 F.2d at 445.

In the instant case, Special Agent Joseph Benitez, who participated in the meeting at the convenience store parking lot on December 1, 1982, testified about Portal's conduct at that meeting. Benitez stated that he was introduced to Portal by Agent Rios. Portal assured Benitez that he could make an immediate delivery of two kilograms of cocaine. Portal then made a phone call to Concepcion, and told Concepcion that he had somebody who would buy the "powder." Finally, after completing the phone call, Portal told Benitez that his "connection" could deliver the cocaine, and that the cocaine would be available by the next morning.

The testimony of Agent Benitez was sufficient to satisfy the government's burden of persuasion on the issue of Portal's predisposition to commit the crime of conspiracy to possess with intent to distribute cocaine. Although Portal later testified to a different version of the events that occurred at the parking lot that night, the jury was free to choose between the testimony of Agent Benitez and that of Portal. *See United States v. Goodwin,* 625 F.2d 693, 698 (5th Cir.1980) ("Once the government comes forward with sufficient evidence that the defendant was predisposed to commit the crime rather than entrapped, the case may go to the jury."). Our role is simply to determine whether the evidence was sufficient for the district court to submit the issue of Portal's entrapment to the jury.[30] We conclude that the evidence of Portal's predisposition was sufficient, and

---

**30.** We note that the district court submitted the issue of Portal's entrapment to the jury with a proper set of instructions.

we hold that the district court did not err by refusing to grant Portal's motion for a judgment of acquittal based on entrapment.

### H. Did the District Court Err By Refusing to Grant a Severance So That Appellants Rios and Raymond Could Be Tried Separately?

Appellants Rios and Raymond contend that the district court erred by refusing to grant a severance so that they could be tried separately from their codefendants. The two appellants claim that the evidence concerning the murder of Agent Rios, a crime with which they were not charged, was so highly prejudicial that it necessarily "spilled over" and prevented them from receiving a fair trial. The two appellants urge, therefore, that their convictions be reversed. Although the possible effects of "spillover" prejudice in the instant case are somewhat troubling, we cannot say that the district court abused its discretion by refusing to grant a severance. We therefore decline to reverse the two appellants' convictions.

Joinder under Rule 8(b) of the Federal Rules of Criminal Procedure is proper where, as here, an indictment charges multiple defendants with participation in a single conspiracy and also charges some but not all of the defendants with substantive counts arising out of the conspiracy. *United States v. Zielie*, 734 F.2d 1447, 1463 (11th Cir.1984), *petition for cert. filed*, 53 U.S.L.W. 3530 (U.S. Oct. 26, 1984) (No. 84–1049), *cert. denied*, — U.S. —, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985); *United States v. Weinrich*, 586 F.2d 481, 495 (5th Cir.1978), *cert. denied*, 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979). Furthermore, the general rule is that defendants who are jointly indicted should be tried together, and this rule applies with particular force to conspiracy cases. *United States v. Walker*, 720 F.2d 1527, 1533 (11th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984); *United States v. Howell*, 664 F.2d 101, 106 (5th Cir. Unit B 1981), *cert. denied*, 455 U.S. 1005, 102 S.Ct. 1641, 71 L.Ed.2d 873 (1982). Nevertheless, severance may be granted in the discretion of the district court under Rule 14 of the Federal Rules of Criminal Procedure if the court determines that prejudice will result from the joinder. *Zielie*, 734 F.2d at 1464; *Walker*, 720 F.2d at 1533. Denial of a motion for severance is reversible only for an abuse of discretion. *Zielie*, 734 F.2d at 1464; *United States v. Phillips*, 664 F.2d 971, 1016 (5th Cir. Unit B 1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). Appellate courts are reluctant to second guess a district court's denial of a motion for severance. *Zielie*, 734 F.2d at 1464; *Phillips*, 664 F.2d at 1017.

In deciding a Rule 14 motion for severance, a district court must balance the right of the defendant to a fair trial against the public's interest in efficient and economic administration of justice. *Zielie*, 734 F.2d at 1464; *Walker*, 720 F.2d at 1533. Severance will be granted only when the defendant can demonstrate that a joint trial will result in "specific and compelling prejudice" to the conduct of his defense. *Zielie*, 734 F.2d at 1464; *United States v. Marszalkowski*, 669 F.2d 655, 660 (11th Cir.), *cert. denied*, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 167 (1982). It is not enough for the defendant to show that acquittal would have been more likely had the defendant been tried separately, since some degree of bias is inherent in a joint trial. *Walker*, 720 F.2d at 1533; *Marszalkowski*, 669 F.2d at 660. Furthermore, a defendant does not suffer "compelling prejudice" simply because much of the evidence at trial is applicable only to his codefendants. *Zielie*, 734 F.2d at 1464; *United States v. Berkowitz*, 662 F.2d 1127, 1135 n. 8 (5th Cir. Unit B 1981). Rather, "[t]he remedy of severance is justified only if the prejudice flowing from a joint trial is clearly beyond the curative powers of a cautionary instruction." *Phillips*, 664 F.2d at 1017 (quoting *United States v. Morrow*, 537 F.2d 120, 136 (5th Cir.1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977)).

In the instant case, we must decide whether the jury could follow the district court's cautionary and admonitory instructions and determine the guilt or innocence of each defendant solely on the basis of that defendant's conduct. *See Phillips*, 664 F.2d at 1017. When the government sought to introduce tangible evidence relating to the murder of Agent Rios and the assault on Agent D'Atri, the court cautioned the jury not to consider that evidence in deciding the guilt or innocence of appellants Rios and Raymond:

I will be instructing you, ladies and gentlemen, that you may, in consideration of the case and the issues before you, consider this evidence as it relates to the issues of Counts III and IV in which counts ... Mr. Rios [and] Mr. Ramon Raymond are not charged.

In other words, this evidence will be considered by you when you decide and determine the issues involved in Counts III and IV but not in Counts I and II.

. . . .

[T]hese two defendants are not charged in Counts III and IV.

So, in other words, this evidence is only being admitted for the purpose of being considered in the allegations of murder and assault with a deadly weapon.

. . . .

You may not consider it when you are considering the cocaine conspiracy allegations and the cocaine distribution allegations of Count I and II. . . .

Shortly thereafter, the court issued another cautionary instruction:

Ladies and gentlemen, you will recall that ... Rios and Ramon Raymond are not charged in the complaint with anything to do with weapons; that is, the murder or the allegations concerning use of a deadly weapon in the commission of a felony or the allegations of an assault, so any items, that is, guns, ammunition or these other exhibits you have been looking at that pertain only to those counts, should not be considered in any way against [Raymond] or [Rios].

That is to say, should not be considered with respect to Ramon Raymond or Rolando Rios.

The court also refused to allow the government to introduce particularly inflammatory or prejudicial evidence, such as artist's sketches of the shoot-out and several photographs of Agent Rios' body. At the end of the trial, the court instructed the jury that the guilt or innocence of each defendant should be determined separately and individually, and that the verdict as to any one defendant should not have any bearing on the verdict as to the other defendants.

In our opinion, these cautionary instructions and rulings minimized the risk that appellants Rios and Raymond would be harmed by the possible effects of "spillover" prejudice. Although we cannot say with certainty that the two appellants suffered no prejudice from the district court's refusal to grant a severance, we conclude that they did not suffer "compelling prejudice" and that their rights to a fair trial were not infringed.[31] Accordingly, we hold

---

**31.** The cases most heavily relied upon by the two appellants, *United States v. Engleman*, 648 F.2d 473 (8th Cir.1981), and *United States v. Sampol*, 636 F.2d 621 (D.C.Cir.1980), are inapposite. In *Engleman*, two codefendants were charged with mail fraud and conspiracy to commit mail fraud in connection with a scheme to murder a man so that the man's wife could collect life insurance proceeds. During the trial, the government introduced "prior act" evidence concerning another murder committed by one of the codefendants 13 years before the commission of the crimes charged. The district court refused to grant a motion for severance filed by Robert Handy, the other codefendant. The appellate court reversed, noting that "Handy was

in no way involved in this [prior] scheme." *Engleman*, 648 F.2d at 481. In the instant case, on the other hand, the murder and assault arose out of the same drug transaction that was the subject of the conspiracy and cocaine distribution charges against appellants Rios and Raymond. Therefore, unlike in *Engleman*, at least some of the evidence concerning the murder and assault would have been admissible against the two appellants even in a separate trial.

In *Sampol*, three codefendants were charged with crimes arising out of the assassination of the former Chilean Ambassador to the United States. The appellant, who was charged only with lying to the grand jury and misprision of a felony, moved for a severance. The district

that the district court did not abuse its discretion by refusing to grant a severance, and we decline to reverse the two appellants' convictions.

## I. *The Remaining Claims of Error.*

Finally, all of the appellants raise several additional claims of error, none of which merit extended discussion. The appellants contend that the district court should have granted a change of venue because of pre-trial publicity concerning the murder and funeral of Agent Rios. This contention must be assessed in accordance with due process standards established in *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). *See United States v. Gorel*, 622 F.2d 100, 103 (5th Cir.1979); *United States v. Capo*, 595 F.2d 1086, 1090 (5th Cir.1979), *cert. denied*, 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed.2d 641 (1980). Mere juror exposure to news accounts concerning the crimes with which the appellants were charged does not create an automatic presumption of a denial of due process. *Gorel*, 622 F.2d at 103. Rather, the appellants must demonstrate either that community prejudice "actually invaded the jury box," *Capo*, 595 F.2d at 1090, or that "highly inflammatory publicity" or "intensive media coverage" created "pervasive community prejudice" such that prejudice in the jury box should be presumed. *Id.* The appellants have completely failed to demonstrate either of these prerequisites. In addition, the fact that the appellants failed to use all of their allotted peremptory challenges indicates the absence of juror prejudice. *See Gorel*, 622 F.2d at 103–04. We therefore reject the appellants' change of venue claim.

The appellants next contend that prosecutorial misconduct tainted their trial. The appellants concede that none of the alleged instances of misconduct, standing alone, would warrant the reversal of their convictions. Nevertheless, the appellants contend that the cumulative effect of the incidents rendered their trial unfair. *See United States v. Blasco*, 702 F.2d 1315, 1329 (11th Cir.), *cert. denied*, —— U.S. – ·· , 104 S.Ct. 275, 276, 78 L.Ed.2d 256 (1983). We find this contention meritless. "While due process of law mandates that a fair trial be provided to the appellants, there is no constitutional right to a perfect trial." *Id.* (quoting *United States v. Ragsdale*, 438 F.2d 21 (5th Cir.), *cert. denied*, 403 U.S. 919, 91 S.Ct. 2231, 29 L.Ed.2d 696 (1971)). A review of the record in the instant case reveals that the appellants' trial comported with the highest standards of fairness and professionalism. Most of the alleged instances of misconduct were so minor that they could not possibly have affected the outcome of the trial. In addition, the trial judge admirably discharged his responsibility to cure any prejudicial effect that might have resulted from the incidents. We hold that the appellants are not entitled to a reversal on the grounds of prosecutorial misconduct.

The appellants also contend that the district court erred by admitting into evidence the statements translated by Agent Rios for the benefit of Agent D'Atri. According to the appellants, the translations constituted hearsay inadmissible under Rule 802 of the Federal Rules of Evidence. We disagree. In *United States v. Da Silva*, 725 F.2d 828 (2d Cir.1983), the Second Circuit rejected a nearly identical

court refused to grant the severance, and the appellate court reversed. Significantly, however, the appellant in *Sampol* was not charged with conspiracy, thus rendering the evidence concerning the assassination "largely irrelevant" to the appellant's guilt. 636 F.2d at 646. Furthermore, the evidence concerning the assassination included numerous misleading references to the appellant, leading the appellate court to conclude that it would be *"unreasonable* to expect that the jury succeeded in compartmentalizing the evidence adduced at this trial." *Id.*

at 647 (emphasis in original). Finally, the appellant's codefendants "were accused of participating in an intentional and extremely violent assassination scheme, the gory details of which were described with extreme accuracy to the jury." *Id.* at 646. The instant case is distinguishable on each of these grounds. Appellants Rios and Raymond were charged with conspiracy, the evidence at trial was easily compartmentalized, and the district court refused to allow the introduction of inflammatory or highly prejudicial evidence.

argument, reasoning that the translator was acting as an "agent" of the defendant and the translation was therefore admissible under Rule 801(d)(2)(C) or (D).[32] The *Da Silva* court explained:

> [P]rovided the interpreter has a sufficient capacity, and there is no motive to misrepresent, the interpreter is treated as the agent of the party and the statement is admitted as an admission unless circumstances are present which would negate the presumption of agency.

*Id.* at 831–32 (quoting 4 J. Weinstein & M. Berger, *Evidence* ¶ 801(d)(2)(C)[01], at 801–158 n. 34 (1981)). The court also stated:

> Where, however, there is no motive to mislead and no reason to believe the translation is inaccurate, the agency relationship may properly be found to exist. In those circumstances the translator is no more than a "language conduit," *United States v. Ushakow*, 474 F.2d 1244, 1245 (9th Cir.1973), and a testimonial identity between declarant and translator brings the declarant's admissions within Rule 801(d)(2)(C) or (D).... The fact that [the translator] was an employee of the government did not prevent him from acting as [the declarant's] agent for the purpose of translating and communicating [the declarant's] statements to [the witness]. *See* Restatement (Second) of Agency § 392 (1958) (dual agency permitted).

*Da Silva,* 725 F.2d at 832. We find the reasoning of the *Da Silva* court persuasive, and we cannot accept the appellants' claim that the translations constituted inadmissible hearsay.

**32.** Rules 801(d)(2)(C) and (D) provide:
 A statement is not hearsay if—
 (2) The statement is offered against a party and is ...
 (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship....

**33.** Of course, the district court may exclude persons who attempt to disrupt the trial. *See Weiss v. Burr*, 484 F.2d 973, 984 n. 21 (9th

The appellants finally contend that the district court should not have allowed the BATF agents who testified at trial to remain in the courtroom during the closing arguments. The appellants claim that the presence of the agents either may have reinforced the impact of the agents' testimony or may have influenced the jury by creating an atmosphere of retribution. We reject this argument for several reasons. First, it is wholly speculative; the appellants have presented no evidence tending to show that the presence of the agents actually had an effect on the jury.

Second, the appellants have cited no authority for the view that spectators with a more than casual interest in the outcome of a trial cannot attend all phases of the trial.[33] The Supreme Court has held that, "[a]bsent an overriding interest articulated in findings, the trial of a criminal case must be open to the public." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 581, 100 S.Ct. 2814, 2829–30, 65 L.Ed.2d 973 (1980). Here, the agents were members of the public, and the appellants have raised no "overriding interest" justifying the agents' exclusion from the courtroom. Moreover, it is irrelevant that the agents may have been motivated by a desire for retribution. The Supreme Court has acknowledged that people may choose to attend criminal trials for exactly such reasons:

> When a shocking crime occurs, a community reaction of outrage and public protest often follows.... Thereafter the open processes of justice serve an important prophylactic purpose, providing an

Cir.1973), *cert. denied,* 414 U.S. 1161, 94 S.Ct. 924, 39 L.Ed.2d 115 (1974). The court also may exclude, if necessary, persons whose behavior might influence the jury. *Cf. United States v. Davis*, 532 F.2d 22, 28 (7th Cir.1976) (it was improper for prosecution witness seated at prosecutor's table to rear back and laugh during cross-examination of defendant). Here, however, the appellants do not suggest that the agents' behavior might have disrupted the trial or influenced the jury. Rather, the appellants challenge merely the fact that the agents were present in the courtroom.

outlet for community concern, hostility, and emotion....

Civilized societies withdraw both from the victim and the vigilante the enforcement of criminal laws, but they cannot erase from people's consciousness the fundamental, natural yearning to see justice done—or even the urge for retribution. The crucial prophylactic aspects of the administration of justice cannot function in the dark; no community catharsis can occur if justice is "done in a corner [or] in any covert manner."

*Id.* at 571, 100 S.Ct. at 2824 (citations omitted).

Finally, the fact that the agents had been witnesses earlier in the trial is of no consequence here. The Federal Rules of Evidence provide that "[a]t the request of a party the court shall order witnesses excluded *so that they cannot hear the testimony of other witnesses....*" Fed.R. Evid. 615 (emphasis added); *cf. Geders v. United States*, 425 U.S. 80, 87, 96 S.Ct. 1330, 1335, 47 L.Ed.2d 592 (1976) (purpose of Sequestration Rule, which preceded Rule 615, was to prevent witnesses from "tailoring" their testimony to that of earlier witnesses and to detect testimony that was "less than candid."). By its own terms, Rule 615 is inapplicable after all witness testimony has been concluded. *Cf. United States v. Brown*, 547 F.2d 36, 37 (3d Cir. 1976) ("Rule 615 relates exclusively to the time testimony is being given by other witnesses," hence inapplicable during opening arguments), *cert. denied*, 431 U.S. 905, 97 S.Ct. 1698, 52 L.Ed.2d 389 (1977). As Professor Wigmore has succinctly stated, "the time for sequestration begins with the delivery of testimony upon the stand *and ends with the close of testimony.*" 6 J. Wigmore, Evidence § 1840 (1976) (emphasis added). We hold, therefore, that the court did not err by allowing the agents to remain in the courtroom during the closing arguments.

### III. CONCLUSION

On the basis of the foregoing discussion, we hereby AFFIRM all of the appellants' convictions.